GEORGE E. FRANKLIN, Jr., Appellant, v. THE STATE OF NEVADA, Respondent.

No. 7236

September 10, 1973 513 P.2d 1252

*Franklin & Bartley,* of Las Vegas, for Appellant.

*Roy A. Woofter,* District Attorney, and *Charles E. Thompson,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, BATJER, J.:

The appellant, George E. Franklin, Jr., a member of the Las Vegas Board of City Commissioners, has been indicted and charged with having committed the crime of asking a bribe by a public officer in violation of NRS 197.040. He now appeals from the denial of his petition for a writ of habeas corpus challenging probable cause to hold him for trial.

Franklin is free from custody upon his own recognizance. While in that status he may utilize the remedy of habeas corpus to challenge probable cause to hold him for trial. Jacobson v. State, 89 Nev. 197, 510 P.2d 856 (1973).

A fair reading of the testimony adduced before the grand jury reveals that Johnny Tocco, the owner of a bar in Las Vegas, Nevada purchased other property and desired to transfer his liquor license to the new location. He recognized that he might have some difficulty obtaining authorization for the transfer from the Las Vegas Board of County Commissioners. A mutual friend suggested that he contact Commissioner George E. Franklin, Jr., the appellant, and discuss the entire matter. Tocco contacted Franklin's office and shortly thereafter Franklin arrived at Tocco's establishment and informed Tocco that there was substantial opposition to his request; that he was personally prepared to vote for the transfer; that the opponents were prepared to pay as much as $10,000 to block it,[1] and that for a like sum which he would deliver to other unnamed persons he could obtain a favorable vote for Tocco's

---

[1]Tocco's pertinent testimony before the grand jury about his meetings with Franklin:

"A. Oh, all right. Well, he says, 'I tell you what,' he says, 'If you can come up with a like amount,' he says 'I believe I can get it on for you.' I says, 'You mean $10,000?' He says, 'Yes.'

. . . .

"A. Well, he says, 'If you can come up with the like amount of money,' he says, 'I can get it on.' And I says to him, 'Well, George,' I says, 'how in the hell can you tell me that if I come up with $10,000 and meet the same demand that is being put up by the Mirabelli forces that you stated, that you would drop Mirabelli in my favor?' I says, 'After all, I'm just a small businessman.'

"I says, 'Phil's pretty well known in the town, he's pretty powerful and, I says, 'You're willing to drop him for the ten?' He says, 'That's it. That's what its going to take.' He says, 'I can get it on.'

"Q. Did he tell you what he meant by, 'get it on?'

"A. Well, I guess—

"Q. Not guess. Did he tell you?

"A. No, he didn't tell me. Just says he needs $10,000 to do it. But he didn't tell me who he was going to give it to."

. . .

"Q. You say, 'he,' you mean Mr. Franklin?

"A. Mr. Franklin.

"Q. And what did he say then?

"A. Well, I says to him, I says, 'Now, you know if the bank gives me a loan they'll probably give me the certified checks.' I said, 'do you want the certified check?'

. . .

"A. He says, 'Hell, no,' he says, 'take the check and give it to one of the tellers and get it cashed, and bring me $10,000 in one-hundred-dollar bills.'

. . .

"A. Well I says to him, 'When I bring the money,' I says, 'Who is going to handle it?' He says, 'I'm going to handle it.'

. . .

"A. Well he told me, he says, 'Now, the money isn't for me.' He

request. Franklin made several visits to Tocco's establishment to determine if Tocco had been able to raise the $10,000. Tocco was unsuccessful in his efforts. In the meantime Tocco had reported Franklin's request to a deputy district attorney and the district attorney's office began an investigation. No money was ever delivered. Franklin apparently became aware of the district attorney's investigation and reported his version of the affair to the mayor and other commissioners and later he gave a taped exculpatory statement to members of the district attorney's staff

At the grand jury hearing the mayor and all the other members of the commission testified that they never sought any payment from Tocco through Franklin or otherwise. A bank official testified concerning Tocco's effort to borrow $10,000 during the time that the Tocco-Franklin meetings were occurring.

1. Among other contentions, Franklin claims that the district court erred in denying habeas because of several instances of alleged prosecutorial misconduct:

(1) The matter as presented to the grand jury was entitled "State of Nevada v. George Franklin;"

(2) The prosecutor delivered to the members of the grand jury copies of the statutes claimed to have been violated by the appellant; and

(3) Only "true bill" forms of indictment were presented for the grand jury.

---

says, 'I'm getting no part of it.' That he told me. He says, 'It's got to go to others.' He didn't mention any names of—
"Q. Did George indicate to you at all how he was going to vote on this at anytime?
"A. Well, he told me, he says, 'I told you at our first meeting that I would go for you and,' he says, 'as far as money is concerned, the money is not for me at all.'
"Q. Did he tell you who it was for?
"A. No, he didn't.
"Q. Would you relate to us again the exact words that were said involving that?
"A. Well, he told me again he was going to take care of others, and he said to me—now, he says, 'I'm going to tell you,' he says, 'I had a luncheon date this afternoon with two of the commissioners at the Sahara Hotel.'
"Q. Did he say who those commissioners were?
"A. I asked him and he says, 'Yeah,' he says, 'Coblentz and Thornley.'
"Q. Did he discuss at all any difficulty or problems he might have getting this vote?
"A. Well, he said that one of them was kind of hesitant about going along because he was committed to the other side."

The appellant has cited no authorities to support these assignments of error. If an appellant fails to present authorities in support of an alleged error we will consider the assignment only if the error is so unmistakable that it is revealed by the casual inspection of the record. Williams v. State, 88 Nev. 164, 494 P.2d 960 (1972); Carson v. Sheriff, 87 Nev. 357, 487 P.2d 334 (1971). Here a careful inspection of the record, in light of our conception of the applicable law, reveals no error in the district court's interpretation.

2. The appellant further claims prosecutorial misconduct and error because five members of the district attorney's staff were present when evidence was presented to the grand jury.

In support of this assignment of error the appellant relies upon In re Opinion of the Justices, 94 N.E. 852 (Mass. 1911). His reliance is misplaced because the Supreme Judicial Court of Massachusetts in Commonwealth v. Favulli, 224 N.E.2d 422 (Mass. 1967), approved the presence of six prosecutors before the grand jury on two occasions, and specifically found that Opinions of the Justices, supra, was not in point because it dealt with the presence of persons other than duly appointed prosecutors.

In presenting a case to a grand jury a prosecutor and his assistants are authorized to recite and explain the law and to present legal evidence (NRS 172.135(1)) but they must scrupulously refrain from words or conduct that will invade the province of the grand jury or tend to influence the jurors in their judgment. Commonwealth v. Favulli, supra; State v. Good, 460 P.2d 662 (Ariz. 1969). To accomplish an explanation of the law and the presentation of the evidence a prosecutor may have present from time to time such reasonable number of assistants as he deems appropriate. Commonwealth v. Favulli, supra. Here there was never more than three assistant district attorneys present. This was not an unreasonable number. The other two members from the district attorney's staff who were present were a secretary and a bailiff. Both were specifically requested by the grand jury and authorized by statute to be present when the grand jury was in session but not deliberating or voting. NRS 172.205; NRS 172.235; Turpin v. Sheriff, 87 Nev. 236, 484 P.2d 1083 (1971). Furthermore the appellant admits that there was nothing "illegal or impermissible" about their presence. There is nothing in this record to indicate that the conduct of the district attorney's staff was contrary to those fundamental principals

of liberty and justice which lie at the base of all our civil and political institutions. (Palko v. Connecticut, 302 U.S. 319 (1937).) There was no violation of due process. Cf. State v. Joao, 491 P.2d 1089 (Haw. 1971).

3. Franklin contended before the district court that the two magnetic tape recordings which were played to the grand jury were illegally introduced into evidence and that they so infected the entire record that dismissal of the indictment was mandatory. Such a challenge to the validity of the grand jury proceedings is properly made by motion (NRS 173.105(1)) and not by pretrial habeas corpus proceedings. Cook v. State, 85 Nev. 692, 462 P.2d 523 (1969); Turpin v. Sheriff, 87 Nev. 236, 484 P.2d 1083 (1971). Nevertheless, the district court suppressed the magnetic tape recording of the telephone conversation between Franklin and Tocco and held admissible the magnetic tape recording of Franklin's exculpatory statement to members of the district attorney's staff. No cross appeal has been filed to question the propriety of the challenge to the grand jury proceedings through a petition for habeas corpus. See NRS 177.015(2).

It is difficult for us to understand why the prosecution would jeopardize the record in this case by introducing the two magnetic tape recordings. We will consider them only to determine whether their introduction before the grand jury could have poisoned the entire record requiring dismissal of the indictment.

Here the other evidence presented to the grand jury is of sufficient legal quality to support the indictment and we do not pause to decide the validity of the material contained in the magnetic tape recordings because the legal efficacy of an indictment will be sustained if there has been presented to the grand jury the slightest sufficient legal evidence and best in degree even though inadmissible evidence may also have been adduced contrary to NRS 172.135. Robertson v. State, 84 Nev. 559, 445 P.2d 352 (1968). In State v. Logan, 1 Nev. 509 (1865), this Court said: "That a grand jury should receive none but legal proof, is an old and well-established rule, but that the admission of evidence not strictly legal will authorize a setting aside of an indictment, is a proposition which seems to have no authority to sanction it, and, if adopted, would only be an impediment to the execution of criminal justice, . . . but where there is the slightest legal evidence, the court cannot

inquire into its sufficiency, or set it aside, because some illegal evidence was received with it."

A number of other jurisdictions adhere to a similar rule. See Coppedge v. United States, 311 F.2d 128 (D.C.Cir. 1962); United States v. John Doe, 455 F.2d 1270 (1st Cir. 1972); People v. Freudenberg, 263 P.2d 875 (Cal.App. 1953); People v. Edwards, 249 N.Y.S.2d 325 (Orleans County Ct. 1964); Silbert v. State, 280 A.2d 55 (Md.App. 1971); Wickline v. Alvis, 144 N.E.2d 207 (Ohio App. 1957); State v. McDonald, 361 P.2d 1001 (Ore. 1962); Burton v. State, 377 S.W.2d 900 (Tenn. 1964).

The only meritorious question before us is whether the district court erred in holding that the inference drawn by the grand jury that the appellant committed the crime of asking a bribe was reasonably drawn or deduced from the facts presented.

Tocco testified that Franklin insisted that the $10,000 was not for him, but for the others, and that he did not name the "others". The mayor and other commissioners all testified that they had never solicited any bribe from Tocco through Franklin or otherwise. The jurors could have reasonably inferred that the "others" were other commissioners who would through their vote control the transfer of Tocco's liquor license and if the other commissioners were not to receive the $10,000, then Franklin intended to keep the money for himself. Cf. Ex Parte Kline, 71 Nev. 124, 282 P.2d 367 (1955).

Examination of the record convinces us that the state sufficiently connected the appellant to the crime and that the district court was justified in denying his petition.

The quality and persuasive force of evidence necessary to support an indictment are expressed in NRS 172.135(1) and NRS 172.155. Cf. State v. Eddington, 83 Nev. 359, 432 P.2d 87 (1967). A grand jury "ought to find an indictment when all the evidence before them, taken together establishes probable cause to believe that an offense has been committed and that the defendant has committed it." NRS 172.155(1). See State v. von Brincken, 86 Nev. 769, 476 P.2d 733 (1970). The grand jury does not determine guilt or innocence, but needs only to have before them legally sufficient evidence to establish probable cause. Kinsey v. Sheriff, 87 Nev. 361, 487 P.2d 340 (1971).

The district court has laboriously and meticulously considered and dealt with every facet of this case. In Lutwak v. United States, 344 U.S. 604 (1952), the High Court said: "A defendant is entitled to a fair trial but not a perfect one." An accused is entitled to fair but not perfect consideration before the grand jury. Here the appellant received fair consideration. We find no error and affirm its order.

THOMPSON, C. J., and MOWBRAY, J., concur.

ZENOFF, J., concurring:

The thin requirements of probable cause to bind an accused over for trial have troubled me, yet because this court has often reaffirmed those simple standards it seems fruitless to disagree. Nevertheless, I am constrained to observe that a man's reputation was once so respected that the devices of the preliminary hearing and grand jury were instituted to give protection against weak or groundless accusations. Proof positive was necessary for an accusation to be sufficiently strong to bring the accused to trial on the premise that a man should not be put to shame or the expense of defending himself needlessly.

In this case the accusation consists practically of bar owner Tocco's word against that of a public official. The $10,000 was not borrowed or otherwise obtained by Tocco, no sums were paid to anybody at anytime before the application was denied. Of the parade of witnesses only one bore directly on the accusation and that was the testimony of an admitted parole jumper from a foreign state who "happened" to be buying a drink in the bar and said he overheard a conversation between people he did not know. Furthermore, he was a stranger in the community.

The past decisions of this court that have approved such low quality evidence solely compels my concurrence.

GUNDERSON, J., dissenting:

Perhaps with the highest motives, the District Attorney's staff placed before the Grand Jury a mass of pseudo evidence, obscuring that the case against Commissioner Franklin rests on the credibility of bar owner John Tocco and fugitive convict James Kronke. It was within the Grand Jury's province to determine their testimony was not credible, and therefore not probable cause to prosecute Mr. Franklin. State v. Fuchs,

78 Nev. 63, 68, 368 P.2d 869, 871 (1962); In re Oxley and Mulvaney, 38 Nev. 379, 385, 149 P. 992, 994 (1915); Ex Parte Wm. Willoughby, 14 Nev. 451, 452 (1880). And the Grand Jury might well have so decided, if it had been permitted to evaluate the testimony of Tocco and Kronke on its own merits, without illusory "corroboration."

The majority opinion omits to discuss this problem, which I consider the most disturbing aspect of the case before us. Thus, I have no idea how, if at all, the majority would justify "witnesses" like Lt. James Smith, of the Las Vegas Police Department. His testimony is that he got "involved in this controversy" on June 20, when he was "contacted by Mr. Bruce Greenhalgh, who is the Chief Investigator for the Attorney General's Office." Although Smith did not state explicitly what Greenhalgh said, that was indicated by Smith's testimony concerning a meeting later that day with Greenhalgh, Attorney General List, and Chief Deputy Attorney General Gary Logan, in Logan's Las Vegas office.[1] By this testimony, the District Attorney's staff evidently sought to convince the Grand Jury that the Attorney General himself as well as his top assistants took Tocco's accusation seriously, and that therefore the Grand Jury should also. From Smith's only other testimony, concerning a visit Commissioner Hank Thornley made to Frankie's Bar, the District Attorney's staff apparently wished the Grand Jury to draw the highly speculative inference that something sinister was indeed transpiring concerning bars on Charleston Boulevard, in which Mr. Franklin, as a member of the City Commission, was probably implicated.

---

[1]Smith testified that he tried, unsuccessfully, "to acquire $10,000 in counterfeit money from the Secret Service for Mr. Greenhalgh to use as bait money, and I brought with me a transmitter and receiver, equipment to wire a man." He met Mr. Greenhalgh, Attorney General List, and Chief Deputy Attorney General Gary Logan in the latter's Las Vegas office, and sat there "while they discussed the situation, and Mr. Tocco showed up," whereupon Tocco supposedly "related the situation." Finally, "[a]s a result of events that happened, the Attorney General elected to call the Clark County District Attorney's Office, and once their investigation was commenced there was no need for me and I left."

Smith then went on to testify that the following day, about 9:05 A.M., he "was going out West Charleston to make a right-hand turn on Rancho Road to go out Tonopah Highway." By chance, Smith said, he saw Commissioner Hank Thornley entering Frankie's Bar on West Charleston. (Former City Commissioner Phil Mirabelli, who opposes the transfer of Tocco's liquor license, has an interest in Frankie's.) About 40 minutes later, again by chance, Smith said he "saw Mr. Thornley leaving" shortly before a City Commission meeting that was scheduled for 10:00 A.M.

To take other examples, Attorney General List, Rex Bell, and Gary Logan also testified about their investigatory efforts, which so far as I can see produced no evidence whatever against Mr. Franklin. Their testimony, like that of Lt. Smith, really showed nothing except that Tocco had accused Franklin and that List and others took him seriously.

Deputy District Attorney Leon Simon, who represented the District Attorney at oral argument before this court, acknowledged that such testimony would not be admissible as part of the State's case in chief. Another deputy, who appeared with Mr. Simon, seemed to believe that anything said or done outside a defendant's presence is proper evidence, except that a witness may not recite explicitly what another person said. Of course, the latter deputy's notion conflicts with the hearsay rule as understood since Wright v. Tatham, 112 Eng. Rep. 488 (1837). See also: J. Ball, Conduct as Hearsay, 41 L.A. Bar Bul. 558 (1965–66). Moreover, whatever may be the status of Wright v. Tatham's doctrine in Nevada (consider NRS 51.035–45), I trust my brethren agree that irrelevancy remains a ground for excluding testimony concerning unproductive police activity. If we permit prosecutors to present matter that remote from the central issues in criminal cases, the state will need to quadruple its judicial forces.

This is not a case involving a negligible amount of improper evidentiary matter, inadvertently placed before the Grand Jury. (If it were, I would view the matter as does my brother Zenoff.) Here, to assure an indictment the Grand Jury might otherwise have refused, the District Attorney's staff called a number of witnesses whose testimony was either largely or totally inadmissible, and necessarily prejudicial. In so doing, I feel, the prosecution invaded the province of the Grand Jury. Hence, I would grant appellant's petition, and require the District Attorney's staff to resubmit the case correctly, either to a new Grand Jury or to a magistrate. As the Supreme Court of Hawaii has said:

"We cannot second guess the grand jury by assuming that it would have returned an indictment against [Mr. Franklin] even if the character of the proceedings had been other than what it was." State v. Joao, 491 P.2d 1089, 1091 (Hawaii 1971).